## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KATHLEEN J. MYERS, on behalf of the Seventy Seven Energy Inc. Retirement & Savings Plan and a class of similarly situated participants of the Plan, | ) ) ) ) |
| Plaintiff, | ) ) Case No.  CIV-17-200-D |
| v. | ) ) |
| THE 401(K) FIDUCIARY COMMITTEE FOR SEVENTY SEVEN ENERGY, INC. a/k/a THE ADMINISTRATIVE COMMITTEE; | ) JURY TRIAL DEMANDED ) ) ) |
| JOHN DOES 1-10; and | ) ) |
| DELAWARE CHARTER GUARANTEE & TRUST COMPANY d/b/a PRINCIPAL TRUST COMPANY; | ) ) ) ) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT

Plaintiff Kathleen J. Myers ("Plaintiff"), on behalf of the Seventy Seven Energy Inc. Retirement & Savings Plan (the "Plan") and a class of similarly situated participants in the Plan, brings this action against the 401(k) Fiduciary Committee for Seventy Seven Energy, Inc. a/k/a the Administrative Committee (the "Committee"), John Does 1-10 as the individual members of the Committee (together with the Committee, the "Committee Defendants") and Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company ("Principal Trust") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.

1

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      Plaintiff, a participant in the Plan during the Class Period, brings this action concerning the Plan's imprudent investment in the common stock of Chesapeake Energy Corporation ("Chesapeake") on behalf of the Plan and on behalf of a class of all participants in the Plan whose retirement assets were invested in Chesapeake from July 1, 2014 to the date of judgment in this Action (the "Class Period").

2.      The Committee Defendants and Principal Trust wrongfully and imprudently invested the Plan's assets in Chesapeake stock in the Plan's employee stock ownership plan (ESOP) component. Their actions violated ERISA in several ways. First, under ERISA, ESOPs must invest in employer securities. Chesapeake stock was not an "employer security" under ERISA and should never have been held in the Plan's ESOP. Defendants should not have allowed the Plan to make the investment.

3.      Second, the Plan's investment in Chesapeake stock violated ERISA's prudence requirement and was reckless under any common-sense investment strategy. Chesapeake is in the oil and gas industry, a very volatile, high-risk sector of the economy subject to frequent boom-and-bust cycles. The Committee Defendants ignored the numerous warning signs that existed before the Class Period showing that Chesapeake was an imprudent investment for retirement assets, and instead allowed the Plan to invest more than 44% of its assets in this one stock. The Committee Defendants did not take any action as the price of Chesapeake stock declined over *70 percent*, from $29 per share to $7 per share during the Class Period, causing the Plan to lose tens of millions of dollars in assets that should have been used for participants' retirement.

2

4.     Third, the Committee Defendants violated their duty under ERISA to diversify the Plan's investments. Despite recognizing that investing in a single company's securities was "not diversified and exposes investors to a higher risk of loss," the Committee Defendants allowed the Plan to have a high percentage of its assets concentrated in Chesapeake stock and let the Plan buy millions dollars of additional shares of Chesapeake during the Class Period.

5.     Fourth, the Committee Defendants violated their duty under ERISA to accurately convey the Plan's terms to participants. The Committee Defendants told participants the ESOP's purpose was to invest in the stock of Seventy Seven Energy, Inc. ("Seventy Seven"), rather than truthfully telling them that the ESOP was primarily, and heavily, invested in Chesapeake stock throughout the Class Period.

6.     As a result of these breaches, each Defendant is liable to the Plan for all losses resulting from each of their breaches of fiduciary duty. Plaintiff also seeks equitable relief.

## JURISDICTION AND VENUE

7.     *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.     *Personal Jurisdiction.* This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

9.     *Venue.* Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered, some or all of the fiduciary breaches

for which relief is sought occurred, and one or more Defendants reside or may be found, in this district.

## PARTIES

### Plaintiff

10.     Plaintiff Kathleen J. Myers was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of Chesapeake stock in her Plan account, during the Class Period.

11.     During the Class Period, the value of Chesapeake shares within Plaintiff's Plan account diminished considerably and she, like thousands of other Plan participants, suffered losses resulting from Defendants' breaches of fiduciary duty.

### Defendants

12.     Defendant 401(k) Fiduciary Committee of Seventy Seven Energy, Inc. Retirement & Savings Plan a/k/a the Administrative Committee (the "Committee") is an unincorporated association with a principal place of business in Oklahoma City, Oklahoma. At all relevant times, the Committee administered the Plan and was a fiduciary of the Plan. *See* Plan's 2014 Financial Statements at p. 4.

13.     The Committee was also a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over management of the Plan and the management or disposition of Plan assets and/or had discretionary authority to appoint and monitor Plan fiduciaries who had control over management or disposition of Plan assets.

4

14.     John Does 1 through 10, inclusive, are the other individual members of the Committee, and any other committee(s) responsible for carrying out the provisions of the Plan, and their names and identities are currently not known. Upon information and belief, John Does 1 through 10 are senior executive officers of Seventy Seven who knew or should have known the facts alleged herein.

15.     Defendant Delaware Charter Guarantee & Trust Company is a Delaware corporation that does business as "Principal Trust Company" and has a principal place of business in Wilmington, Delaware. At all relevant times, Principal Trust was the Plan's trustee and a fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority or control over management of the Plan and authority or control over the disposition of Plan assets.

## DESCRIPTION OF THE PLAN

16.     At all relevant times, the Plan was an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

17.     At all relevant times, the Plan was a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34) because it provided individual accounts for each participant and benefits based upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which could be allocated to such participants' accounts.

18.     On June 30, 2014, Seventy Seven separated from Chesapeake in a series of transactions that the companies refer to as a "spin-off." Before the spin-off, Seventy Seven

5

was an Oklahoma limited liability company that operated as "Chesapeake Oilfield Operating, L.L.C." ("COO") and was an indirect, wholly-owned subsidiary of Chesapeake. Under the spin-off, shares of Seventy Seven were distributed *pro rata* to Chesapeake's shareholders and Seventy Seven became an independent, publicly traded company. *See* Plan's 2014 Financial Statements at p. 5.

19.     In conjunction with the spin-off from Chesapeake, Seventy Seven's board of directors established the Plan effective July 1, 2014. The Plan is a spin-off from the Chesapeake Energy Corporation Savings and Incentive Stock Bonus Plan ("CHK Plan"). *See* Plan Document at p. 1.

20.     The Plan covers all employees of Seventy Seven (except certain categories such as leased employees) that meet certain eligibility requirements. The Plan's purpose is to provide a retirement income for Seventy Seven's employees. *See* Plan Prospectus at p. 16. The Plan does not cover Chesapeake's employees.

21.     Seventy Seven's employees are automatically enrolled in the Plan and defer 4% of their pay. *See* Plan Prospectus at p. 6. If a Plan participant does not chose a different percentage, his or her contributions would automatically increase each year by 1%, up to a maximum of 10%. *Id*.

22.     The Plan had a "matching" feature whereby Seventy Seven made contributions to participants' individual Plan accounts. *Id*. at p. 6. When the Plan was established, Seventy Seven matched participants' contributions up to 15% of their total compensation. *See* Plan Document at § 3.01(b). That percentage was later reduced to 6%. *See* Amendment No. 1 to Plan Document dated December 31, 2014 at p. 3. In addition,

Seventy Seven could make an annual contribution to participants' accounts in an amount subject to Seventy Seven's discretion. *See* Plan Document at § 3.01(e); *see also* Plan Prospectus at p. 7.

23.     Seventy Seven's matching and discretionary contributions were both made in the form of "Qualifying Employer Securities." *See* Plan Document § 3.01. The Plan defined "Qualifying Employer Securities" as the "common stock issued by the Employer . . . ." *See* Plan Document at p. 14. The Plan Prospectus states that "[m]atching contributions and ESOP discretionary contributions…are made in the form of Seventy Seven Energy, Inc. common stock." *Id*. at p. 14; *see also* Summary Plan Description at p. 27.

24.     "Qualifying Employer Securities" were to be invested in the "Qualifying Employer Securities Fund," defined as the portion of the Plan's assets that "are designated to be held primarily or exclusively in Qualifying Employer Securities" as part of the "employee stock ownership plan (ESOP) component of the Plan." *See* Plan Document at p. 15. The Seventy Seven stock contributed to the Plan pursuant to the Plan's matching and discretionary contribution features was held in the ESOP. The Plan Prospectus states that the ESOP was for participants to have "an ownership interest in ***our company*** as well as have an additional source of retirement income." *See* Plan Prospectus at p. 30 (emphasis added).

25.     The Plan Prospectus provides that participants would have "22 core investments funds" in which they could invest their retirement savings. *See* Plan Prospectus at p. 10. The Committee Defendants decided "which options (were) available

for (participants') accounts." *Id*. At least annually, the Committee Defendants were required to review "all pertinent Employee information and Plan data…to determine appropriate methods for carrying out the Plan's objectives." *See* Plan Document at § 4.01.

26.    Plan participants were not allowed to invest their contributions (distinct from the matching or discretionary contributions made by Seventy Seven) in Seventy Seven stock because "this investment option is not diversified and exposes investors to a higher risk of loss than other investment options." *See* Plan Prospectus at p. 14.

27.    Seventy Seven established a trust fund to hold and distribute the Plan's assets and appointed Principal Trust as the trustee. *See* Directed Trust Agreement Defined Contribution dated June 30, 2014 ("Trust Agreement") at §§ .02, .03.

28.    Under the Trust Agreement, Principal Trust was required to invest the contributions made by the Plan's participants and Seventy Seven in financial products such as: (a) annuity contracts; (b) money market funds; (c) exchanged-traded funds (ETFs) and mutual funds; and (d) "qualifying employer securities" as the term is defined in I.R.C. § 409(l), 26 U.S.C. § 409(l) and ERISA § 407(d)(5)(A), 29 U.S.C. § 1107(d)(5)(A). *Id*. at § .05(a). Principal Trust also had the power to "sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction." *Id*. at § .05(b). Principal Trust was a "directed trustee" and thus subject to the direction of the Plan's fiduciaries, including the Committee Defendants, "unless such direction is contrary to ERISA." *Id*. at § .04.

## SUBSTANTIVE ALLEGATIONS

**A.    The Plan Should Not Have Invested In Chesapeake Stock**

1.      **Chesapeake Stock Is Not A "Qualifying Employer Security" Under ERISA And Should Never Have Been Held In The ESOP**

29.     When the Plan was established on July 1, 2014, the CHK Plan transferred $196,210,229 in assets to the Plan. *See* Plan's 2014 Financial Statements at p. 5. Of this amount, a staggering ***$87,038,874***, or ***44.3%***, was invested in Chesapeake stock. *Id.* at p. 11.

30.     The Plan's 2014 Financial Statements incorrectly describe Chesapeake stock as an "employer security." *See* Plan's 2014 Financial Statements at p. 11 and at Schedule H, Line 4i. Defendants violated ERISA by allowing Chesapeake stock to be held in the Plan's ESOP component.

31.     ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6), defines the term "employee stock ownership plan" as a stock bonus plan that is "designed to invest in qualifying employer securities."

32.     ERISA § 3(5), 29 U.S.C. § 1002(5) defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan."

33.     ERISA § 407(d)(1), 29 U.S.C. 1107(d)(1), defines "employer security" as a "security issued by an employer of employees covered by the plan, or by an affiliate of such employer." Under ERISA, a "qualifying employer security" is an "employer security" that is either a stock, a marketable obligation (e.g., a bond) or an interest in a publicly traded partnership. *See* ERISA § 407(d)(5), 29 U.S.C. § 1107(d)(5).

34.    After Seventy Seven's spinoff from Chesapeake, Chesapeake was an independent company that did not own or control Seventy Seven. *See* Chesapeake's 2014 10-K at p. 12. Moreover, Chesapeake also did not act as the "employer" for the Plan's participants. For example, Chesapeake did not pay participants' wages, make contributions to the Plan or otherwise act in Seventy Seven's interests concerning the Plan. *See* Seventy Seven's 2014 10-K at p. 12 ("In connection with the spinoff, (Seventy Seven) and Chesapeake entered into an employee matters agreement, which provides that each . . . has responsibility for its own employees and compensation plans."); *see also* Plan's 2014 Financial Statements at p. 11 (classifying Seventy Seven, but not Chesapeake, as a "party-in-interest" under ERISA § 3(14), 29 U.S.C. § 1002(14)). Accordingly, Chesapeake was not an "employer" of Plan participants under ERISA.

35.    Chesapeake was also not an "affiliate" of Seventy Seven after the spin-off and, therefore, its stock does not fall within ERISA's definition of "qualifying employer security." ERISA § 407(d)(7), 29 U.S.C. § 1107(d)(7) provides that a corporation is an "affiliate" of an employer if it is a member of a "controlled group of corporations," a term defined as when a parent corporation owns stock possessing at least 50% of the subsidiary's voting power or when five or fewer individuals, estates or trusts own stock possessing at least 50% of each corporation's voting power. *Id*. citing 26 U.S.C. § 1563. After the spin-off, Seventy Seven was an independent, publicly-traded company in which Chesapeake had "no ownership interest." *See* Chesapeake's 2014 10-K at p. 12. Accordingly, Seventy Seven and Chesapeake were not "affiliates" after the spin-off occurred on June 30, 2014.

10

36.     As Chesapeake was not an "employer" or an "affiliate" for the Plan after the spin-off, Chesapeake stock was not a "qualifying employer security" that could have been held in an "employee stock ownership plan" such as the Plan's ESOP. The Committee Defendants' inclusion of Chesapeake stock within the Plan's ESOP is contrary to both ERISA's plain language and private letter rulings from the IRS that hold that after a corporate spin-off, the previous employer's stock is no longer a "qualifying employer security" for the new employee benefit plan. *See*, *e.g.*, P.L.R. 2014-27-024 at 15.

37.     Under the Trust Agreement, Principal Trust was only permitted to invest the Plan's assets in certain types of investments. Because Chesapeake stock was not a "qualifying employer security," it was not an asset that Principal Trust should have allowed the Plan to own. *Id*. at § .05(a).

38.     Principal Trust also violated its duty to act in the best interests of the Plan and not follow any direction if it was "contrary to the terms of the Plan or ERISA." *See* Trust Agreement at § .04. Principal Trust was obligated to ensure that the Plan complied with ERISA and did not invest in Chesapeake stock, even if it meant disregarding the directions given to it by the Committee Defendants.

**2.     Chesapeake Stock Was A Particularly Risky Investment Throughout The Class Period**

39.     ERISA imposes strict fiduciary duties on fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence,

and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

40.    A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

41.    The Committee Defendants should have been particularly vigilant in monitoring Chesapeake stock because it was historically risky and volatile. Even though Chesapeake stock experienced precisely the volatility that might be expected during the Class Period, the Committee Defendants failed to remove Chesapeake stock from the Plan.

42.    When the Plan was established on July 1, 2014, Chesapeake was the second-largest producer of natural gas and the 10th largest producer of oil and natural gas liquids (NGLs) in the United States. *See*, *e.g.*, Chesapeake's 2014 10-Q dated May 7, 2014 at p. 55. The price of crude oil is volatile and experiences wide price swings in times of shortage or oversupply. *See* http://www.wtrg.com/prices.htm. These price cycles can last several years, to stabilize in response to changes in demand. *Id*.

43.    These risks were known or knowable by the Committee Defendants. Chesapeake's 10-K for the year ending December 31, 2013 stated that ***"[n]atural gas, oil and NGL prices fluctuate widely"*** and that its "revenues, operating results, profitability

and ability to grow depend primarily upon the prices (it) receive for (its) share of the oil, natural gas and NGL (it) sell(s)." *See* Chesapeake's 2013 10-K at p. 23 (emphasis in original). "Historically, the markets for oil, natural gas and NGL have been volatile and they are likely to continue to be volatile." *Id.* "These factors and the volatility of the energy markets make it extremely difficult to predict future oil, natural gas and NGL price movements with any certainty." *Id.*; *see also* Chesapeake's 2014 8-K dated August 4, 2014 at p. 4 ("A change in natural gas, oil and NGL prices has a significant impact on our revenues and cash flows.").

44.     In the years before the spin-off, volatility in the energy market caused Chesapeake's stock to experience extreme volatility. The price of Chesapeake stock was $47.45 per share on June 30, 2008 but then fell to $14.96 on January 1, 2009. The share price rose to $23.44 per share by January 1, 2010, falling and rising again throughout 2010. The price again rose, reaching $32.50 a share on June 30, 2011, only to free-fall to $19.99 a share on January 1, 2012. The price of Chesapeake stock continued to rise and fall in 2013 and had a market price of approximately $29 per share on June 30, 2014 when the spin-off occurred.

45.     These swings made Chesapeake stock a risky investment by objective measures. "Beta" is a measure of a stock's volatility in relation to the market. The stock market as a whole has a beta score of 1.0 and individual stocks are scored according to how much they deviate from the market. A stock whose price is more volatile than the market has a beta score greater than 1.0 and one whose price is less volatile has a score less than 1.0. *See* http://www.investopedia.com/articles/stocks/04/113004.asp.

Chesapeake's beta before the spinoff was above 2.0, meaning that it was **twice as volatile** as the stock market in general.

46.     Chesapeake's underlying financial data in the years preceding 2014 likewise showed that it was not a prudent investment for retirement assets at the amounts held by the Plan. Chesapeake's operating income, earnings per share (EPS), and return on assets fluctuated dramatically while its current liabilities steadily increased as Chesapeake repeatedly re-structured its debts to delay repayments.

47.     Chesapeake's business model was to sell fungible commodities, *e.g.*, oil, natural gas and NGLs, whose prices can be dramatically impacted by macro-economic changes outside of Chesapeake's control. The price of oil is a function of market supply and demand and can be greatly affected by how much the Organization of Petroleum Exporting Countries (OPEC) produces. Generally, higher production from OPEC increases supply which results in lower prices.

48.     In 2008, OPEC dramatically cut its production, leading to historically high oil prices and correspondingly high earnings for Chesapeake. Beginning in 2009, however, OPEC increased its production to its pre-2008 levels, reducing the market price of oil. *See*, *e.g.*, http://peakoilbarrel.com/opec-crude-oil-production-charts/. As described above, these factors caused wide swings in the price of Chesapeake's stock.

49.     The market for natural gas, another large part of Chesapeake's business, also went through systemic changes in the years preceding 2014. During the 2000s the natural gas industry in the United States experienced a boom, especially between 2005 and 2010, when the "country's shale-gas industry, which produces natural gas from shale rock by

bombarding it with water and chemicals – a technique known as hydraulic fracturing, or 'fracking' – grew by 45% a year." *See* "Shale of the century," *The Economist*, June 2, 2012. This over-supply of natural gas caused the price of natural gas to decline dramatically between 2009 and 2014. *See* http://www.eia.gov/dnav/ng/hist/rngwhhdm.htm.

50.     If the Committee Defendants had performed a proper investigation and fulfilled their duty of prudence under ERISA on or around the date the Plan was established on July 1, 2014, they would have realized these risks, known that Chesapeake stock was not a suitable option for the investment of retirement assets at the levels at which the Plan invested and would not have invested the Plan's assets in Chesapeake stock.

51.     The Committee Defendants further breached their duty of prudence *after* the Plan was established by not properly monitoring the Plan's investment in Chesapeake. The market prices for oil and natural gas significantly declined in the second half of 2014, *e.g.*, after the spin-off, causing Chesapeake's share price to fall. By October 1, 2014, shares of Chesapeake had fallen nearly *25%* from the date of the spinoff, from $29 to $22 a share.

52.     Market news and information in the second half of 2014 further showed that energy prices would remain low in the future — warning signs that the Defendants should have recognized would cause the price of Chesapeake stock to further drop. In November 2014, OPEC announced it would maintain its crude oil production target of 30 million barrels a day. The U.S. Energy Information Administration (USEIA) predicted that this supply would outpace consumption, leading to an increase in stored oil, and lower prices. *See* http://www.eia.gov/forecasts/steo/archives/dec14.pdf at p. 3.

53.     On December 9, 2014, the USEIA released its "Short Term Energy Outlook" that provided that there was going to be high uncertainty in the price of oil and that Brent crude oil prices (Brent) would only average $68 per barrel in 2015 and West Texas Intermediate crude oil (WTI) would only average $63 per barrel. *See* http://www.eia.gov/forecasts/steo/archives/dec14.pdf. These prices were significantly lower than the $112 per barrel and $105 per barrel that Brent and WTI sold for respectively in June 2014. *See* http://www.eia.gov/todayinenergy/detail.php?id=19451.

54.     On December 18, 2014, Bill Conerly of Forbes projected that oil prices would fall in 2015 and 2016 and that today's "$60 price is likely to be the high end for the coming two years." *See* http://www.forbes.com/sites/billconerly/2014/12/18/oil-price-forecast-2015-2016/#39d35f023e74. The Forbes article cited many factors for the decline, including slower economic growth, and noted that oil prices had been stagnant for many years due, in part, to increased exploration during periods of high prices that led to lower production costs. *Id*.

55.     Financial analysts predicted that the dramatic fall in oil prices would negatively affect the price of natural gas. In December 2015, the price of natural gas fell to its lowest level since 2012, a decline that was called "just the beginning." *See* http://blogs.ft.com/nick-butler/2015/01/04/after-the-oil-price-fall-is-natural-gas-next/. Unlike oil, the fall in natural gas prices was not due to any production decisions from OPEC or political instability that might be considered short term. Rather, the falling prices were "simply a matter of supply and demand" and the fact that supply was "strong – driven

by high prices in the last few years and the US shale revolution." *Id*. Simply put, there was too much natural gas being produced to maintain the price levels from prior years.

56.     Chesapeake's 10-K for the year ending December 31, 2014 recognized that the low prices for oil and natural gas would significantly impact the company's bottom line. Chesapeake told investors that continued low prices would deplete the cash it had available for capital expenditures (*e.g.*, the exploration of new wells) and hurt its ability to borrow money and raise capital, all of which "could have a material adverse effect on our financial condition, results of operations and reserves." *See* Chesapeake's 2014 10-K at p. 23. Chesapeake "urged" investors to consider these risks. *Id*.

57.     The Committee Defendants ignored these risks and failed to take any action that a prudent fiduciary would have taken to stop the massive losses that Plan participants were suffering due to Chesapeake's free-falling share price.

58.     The Committee Defendants' actions were especially egregious given the Plan's massive, overly-concentrated holding of Chesapeake stock. On July 1, 2014, $87,038,874, or 44.3%, of the Plan's assets were invested in Chesapeake stock, which made it by far the Plan's largest holding. *Id*. at p. 11. The Plan's interest in Chesapeake stock dropped in value by ***$23,662,465*** between July 1, 2014 and December 31, 2014 yet remained by far the Plan's largest investment. As of December 31, 2014, the Plan held $54,520,418 in Chesapeake stock, which was nearly ***4x*** its investment in its next largest holding, a fully diversified Vanguard mutual fund. *Id*. at p. 8.

59.     The Committee Defendants' decision to include Chesapeake stock in the ESOP is even more egregious when considering that the ESOP ***also*** invested in Seventy

17

Seven stock, a company that is not only focused in the energy industry, but whose share price and success were directly dependent on Chesapeake. For the years ending December 31, 2012 and 2013 (prior to the spin-off), Chesapeake accounted for 94% and 90%, respectively, of Seventy Seven's revenues. After the spin-off, Seventy Seven told investors that it was still "dependent on Chesapeake for a significant portion of (its) revenues." *See* Seventy Seven's 2014 10-K at p. 12. Thus, if Chesapeake's business declined, it would not only take down the Plan's investments in Chesapeake but would *also* cause the Plan's investments in Seventy Seven stock to decline.

60.     The Committee Defendants did not remove Chesapeake as a Plan investment or otherwise take action. To the contrary, the Committee Defendants caused the Plan acquire *more* Chesapeake stock throughout 2014 and 2015. *See* Plan's 2014 Financial Statements at Schedule H, Line 4j and Plan's 2015 Financial Statements at p. 11.

61.     Chesapeake's 10-Q for the period ending March 31, 2015 showed how declining market prices for oil, natural gas and NGLs were impacting its financial health. Sales for each commodity between January 1, 2015 and March 31, 2015 were significantly *lower* than the same period in 2014. *See* Chesapeake's 2015 10-Q for period ending March 31, 2015, at p. 49.

62.     Things became so bad for Chesapeake in 2015 that analysts labeled it as one of the "7 indebted oil stocks made for energy risk-takers." *See* http://finance.yahoo.com/news/7-risk-oil-stocks-may-120000546.html. Central to the label as a stock for "energy risk-takers" were the poor macro outlook for oil and gas prices and Chesapeake's inability to sustain appropriate levels of debt before at least 2017. *Id.*

The Committee Defendants, as prudent fiduciaries, should not have allowed the Plan to remain heavily invested in a stock for "energy risk takers." An investment that might be acceptable for a vulture capital fund, willing to take large risks in search for large returns, is not appropriate for a retirement fund.

63.     In May 2015, Chesapeake's share price dropped another 19.4%, ending at approximately $14 a share. Contributing to this decline was an oversupply of natural gas, with the USEIA reporting on May 21, 2015 that natural gas production in the United States had "reached record highs." *See* http://www.eia.gov/todayinenergy/detail.php?id=21332

64.     The price of Chesapeake stock declined through October 30, 2015, ending at approximately $7.00 a share. During this time, Chesapeake fired 1/6th of its employees and announced that it would not pay investors dividends for the first time in 14 years. *See* https://www.bloomberg.com/news/articles/2015-10-01/chesapeake-bonds-crater-on-new-debt-leeway-in-amended-revolver.  On  October  1,  2015,  Bloomberg  noted  that Chesapeake's EBITDA had steadily declined since 2014, and was expected to continue to fall during the third and fourth quarters of 2015. *Id.*

65.     In November 2015, Chesapeake's share price dropped another 30% over concerns the company was "burning through cash, which is putting even more pressure on its  weak  balance  sheet."  *See*  http://www.fool.com/investing/general/2015/12/07/debt-worries-send-chesapeake-energy-corporations-s.aspx. Investors were "growing gravely concerned with Chesapeake's ability to manage its debt given the persistent weakness in oil and gas prices." The Plan, a Chesapeake investor, did not share these "grave" concerns about Chesapeake's share price or how it would affect Plan participants' retirement

savings. Defendants, despite the ability to do so, did not remove Chesapeake stock from the Plan.

66.     In November 2015, Citigroup also determined that Chesapeake had a much lower cash balance than anticipated and Fitch Ratings, one of the "big three" credit rating agencies, downgraded Chesapeake's bonds from BB to BB-, ***another step below investment grade***, because Chesapeake's "cash flow, liquidity, and leverage will be 'notably weaker' than previous expectations." *Id.*

67.     Chesapeake's 10-K for the year ending December 31, 2015 also showed a bleak future for its shareholders. Even with the numerous hedge positions it took to account for what it called the "volatility of the energy markets," Chesapeake predicted its "2016 revenue and results of operations (were) expected to be below 2015 levels." *See* Chesapeake's 2015 10-K at p. 22.

68.     Significantly contributing to Chesapeake's financial problems was its massive debt level. Chesapeake plainly told investors that it had "a significant amount of indebtedness" and that it "may have difficulty paying our debts as they become due." *Id.* at p. 23. It also told investors that its high debt "could materially adversely affect (its) business, financial condition, cash flows and results of operations and could lead to a restructuring, which ***may include bankruptcy filing***." *Id.* (emphasis added).

69.     In April 2016, investment analysts called Chesapeake "an unprecedented mess" that had gone "from bad to worse" due to the continued low energy prices, an "unfavorable" debt maturity schedule and its negative working capital level. *See* http://seekingalpha.com/article/3963747-chesapeake-energy-unprecedented-mess

70.     The price of Chesapeake stock has remained at approximately $7 per share with no upside in sight. From July 1, 2014 until the filing of this Complaint, the price of Chesapeake stock has lost over 70% of its value, causing massive losses to Plan participants' retirement savings.

**B.      The Plan's Investment in Chesapeake Stock Violated the Committee Defendants' Duty to Diversify**

71.     ERISA requires prudent fiduciaries to diversify the plan's investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." *See* ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C). ERISA's legislative history indicates that a fiduciary should not invest an "unreasonably large percentage" of plan assets in a "single security," in "one type of security," or in "various types of securities that are dependent upon success of one enterprise or upon conditions in one locality." *See* ERISA Conference Report on H.R. 2, H.R. Rep. No. 1280, 93d Cong., 2d Sess. 300, 304 (Aug. 12, 1974).

72.     The Committee Defendants acknowledged these prudent, common-sense investment principles. The Plan Prospectus stated that investments in single company's securities were "not diversified and exposes the investor to a higher risk of loss than other investments." *See* Plan Prospectus at p. 34. The Committee Defendants, however, did ***not*** follow these principles.

73.     Incredibly, the Committee Defendants invested ***$87,038,874***, more than 44% of the Plan's assets, in Chesapeake stock on July 1, 2014. This level of concentration in even ***one industry*** is excessive. By comparison, a mutual fund must expressly disclose to

investors if it is going to invest 25% of its assets in one industry because investments at greater percentages "could expose investors to additional risks." *See* Investment Company Release No. 23064, 63 Fed. Reg. 13,916 at 13,927 (Mar. 23, 1998). Here, not only was the Plan's investment over-concentrated in one industry, it was over-concentrated in ***one company*** whose share price was extremely volatile.

74.    Given the Plan's excessive holding in Chesapeake stock and Seventy Seven's dependence on Chesapeake and the acknowledged risks associated with a lack of diversification, a prudent fiduciary would have sold the Chesapeake stock at the time of the spin-off to properly diversify the Plan's assets.

75.    The immediate sale of Chesapeake stock would not have raised any red flags in the investment market or caused any adverse response. To the contrary, if anything, it would have been positive as the Committee Defendants would have announced that they had sold the Chesapeake stock to comply with ERISA, since Chesapeake was no longer the employer of the Plan's participants.

76.    Notwithstanding their duty of diversification, instead of selling Chesapeake stock, the Committee Defendants allowed the Plan to acquire ***even more*** Chesapeake stock in 2014. Between July 1, 2014 and December 31, 2014, the Plan purchased an additional $2,549,082 in Chesapeake stock. *See* 2014 Financial Statements at Schedule H, Line 4j.

77.    At the end of 2014, even with Plan participants contributing more than $13 million to the Plan and the sharp decline in the price of Chesapeake stock, Chesapeake stock ***still*** comprised more than ***30%*** of the Plan's assets. *See* Plan's 2014 Financial

Statements at p. 16. In fact, the Plan's investment in Chesapeake was greater than the ***total*** of Plan's next five largest holdings. *Id*.

78.     In 2015, the Plan purchased additional Chesapeake stock, buying $2,727,621 worth of shares. *See* 2015 Financial Statements at Schedule H, Line 4j. It was ***only*** the free-falling share price of Chesapeake stock, and not any affirmative action from the Committee Defendants, that allowed the Plan to come close to having a properly diversified allocation of assets.

**C.     The SPD And The Plan Prospectus Did *Not* Tell Participants The Plan Would Hold Or Buy Chesapeake Stock.**

79.     ERISA's duty of prudence includes the obligations to disclose and inform. This entails: (1) a duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Plan participants, on the other.

80.     Under the duty to inform, the Committee Defendants were required under ERISA to furnish certain information to Plan participants and furnish a summary plan description to participants that tells them of their rights under the Plan. *See* ERISA §§ 101, 102, 29 U.S.C. §§ 1021, 1022. A summary plan description and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which participants were entitled to rely in determining the identity and responsibilities of

23

fiduciaries under the Plans and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

81. The Committee Defendants provided participants with inaccurate information about the Plan's ownership of Chesapeake stock in the Plan's Summary Plan Description ("SPD") and the Plan Prospectus, both of which were supposed to "explain() how the [P]lan works…" *See* SPD at p. 1; Plan Prospectus at p. 1.

82. The Plan owned massive amounts Chesapeake stock as part of the ESOP component. *See*, *e.g.*, Plan's 2014 Financial Statements at p. 11. The SPD and Plan Prospectus, however, both state that the ESOP's purpose is for participants to "acquire an ownership interest in ***our company***…," a direct reference to Seventy Seven. *See* Summary Plan Description at p. 27 (emphasis added); Plan Prospectus at p. 30 (emphasis added). The Plan Prospectus even defined the term "our" as "Seventy Seven Energy, Inc., an Oklahoma corporation…" and stated that "[m]atching and ESOP discretionary

contributions . . . are made in the form of Seventy Seven Energy, Inc. common stock…" *See* Plan Prospectus at cover page and at p. 14.

83.     The SPD and the Plan Prospectus did *not* mention that the ESOP might hold, let alone did hold, Chesapeake common stock. To the contrary, both wrongfully told participants that the ESOP would *only* hold Seventy Seven stock.

84.     The SPD and the Plan Prospectus also provided inaccurate information about how the assets in participants' individual accounts would be invested. The SPD states that the Committee Defendants decided "which investment options are available for (a participant's) account" but that matching and discretionary contributions would be in the form of Seventy Seven stock. *See* SPD at p. 12.

85.     The Plan Prospectus provided information about the 22 mutual fund investment options from companies such as Vanguard, American Funds and PIMCO, summarized each fund's strategy and risk and listed each fund's rate of return in 2011, 2012 and 2013. *See* Plan Prospectus at pp. 10-14, 36.

86.     The Plan Prospectus did *not* list Chesapeake stock as an investment option for the Plan *or* the ESOP or provide the historical rates of return for Chesapeake stock like it did for each of the Plan's other investment options.[1] *Id*., generally. Nonetheless, the day after the Plan Prospectus was issued, *$87,038,874*, or *44.3%*, of the Plan's assets were invested in Chesapeake stock. *See* Plan's 2014 Financial Statements at p. 11.

---

[1] Seventy Seven was not publicly traded before the spin-off. The Plan Prospectus states "N/A" for the rates of return in 2011, 2012 and 2013. *See* Plan Prospectus at p. 36.

## DEFENDANTS WERE FIDUCARIES

87.     ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

88.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who perform fiduciary functions for a retirement plan. A person or entity is considered a fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

89.     Each of the Defendants was a fiduciary during the Class Period within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) as either a named or a *de facto* fiduciary with respect to the Plan, and each owed fiduciary duties to the Plan and its participants under ERISA.

90.     The Committee was the Plan administrator (*see*, *e.g.*, Plan's 2014 Financial Statements at p. 4) and, as such, had "complete control of the administration of the Plan," including "complete discretion to construe or interpret the provisions of the Plan." *See* Plan Document at § 9.01. Moreover, the Committee had the discretion under the Plan to "establish the funding policy of the Plan and to determine the appropriate methods of

carrying out the Plan's objectives." *Id*. at § 4.01. This discretion included the ability to decide which investment options were available for Plan participants' accounts. *See* Plan Prospectus at p. 10.

91.     Principal Trust was a fiduciary for the Plan because it was the trustee for the trust holding the Plan's assets. *See* Trust Agreement at § .02. Moreover, Principal Trust was a fiduciary because it had the authority to "sell, exchange, convey, transfer or otherwise dispose of" the Plan's assets under the Trust Agreement. *Id*. at § .05(b).

## CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Seventy Seven Energy Inc. Retirement & Savings Plan at any time from July 1, 2014 to the present, inclusive (the "Class Period"), and whose Plan accounts included investments in Chesapeake.

93.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, 5,200 employees of Chesapeake Oilfield Operating, LLC became Seventy Seven employees as a result of the spinoff on July 1, 2014 and, according to the Plan's public filings, there were 5,501 participants in the Plan at the end of 2014.    Accordingly, Plaintiff believes there are

approximately 5,000 participants in the Plan during the Class Period and whose Plan accounts included investment in Chesapeake stock.

94.     Multiple questions of law and fact common to the Class exist, including, but not limited to:

        a.     whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members of the Class;

        b.     whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

        c.     whether Defendants violated ERISA; and

        d.     whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

95.     Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' uniform wrongful conduct in violation of ERISA as complained of herein.

96.     Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class. In addition, Plaintiff has retained counsel skilled and experienced in class action litigation, complex litigation, and ERISA litigation.

97.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of

adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

98.     Class action status is also warranted under Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty against the Committee Defendants)

99.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 98, above.

100.    During the Class Period, the Committee Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.

101.    The Committee Defendants breached their fiduciary duties by wrongfully allowing the Plan to buy and hold Chesapeake stock in the ESOP because Chesapeake was not an "employer" and Chesapeake stock was not a "qualifying employer security" for Plan participants under ERISA. The inclusion of Chesapeake stock in the ESOP was a *per se* violation of ERISA. *See* ERISA § 404(a), 29 U.S.C. § 1104(a).

102.    Moreover, as alleged above, the scope of the fiduciary duties and responsibilities of the Committee Defendants included managing the assets of the Plan for the sole and exclusive benefit of participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. The Committee Defendants were responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, determining how to invest Seventy Seven's matching contributions and ESOP contributions, evaluating the merits of the Plan's investments on an ongoing basis, administering the operations of the Plan and taking all necessary steps to ensure that the Plan's assets were invested prudently.

103.    According to the United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

104.    The Committee Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate Chesapeake stock as an investment in the Plan. They failed to conduct an appropriate investigation of the merits of continued investment in Chesapeake. Contrary to their duties and obligations under the Plan Document and ERISA, the Committee Defendants failed to prudently manage the assets of the Plan. Specifically, during the Class Period, the Committee Defendants knew or should have known that Chesapeake was not, and had never been, a suitable and appropriate investment for the

Plan. Nonetheless, during the Class Period, the Committee Defendants continued to permit the Plan to invest in Chesapeake.

105.    The Committee Defendants could not possibly have acted prudently when they continued to offer or invest the Plan's assets in Chesapeake stock because, among other reasons:

(a)    they knew of and/or failed to understand that Chesapeake stock was not a qualifying employer security;

(b)    they knew of and/or failed to investigate Chesapeake as alleged above;

(c)    The risk associated with the investment in Chesapeake during the Class Period was by far above and beyond the normal, acceptable risk for retirement plan investments.

107.    Knowing these extraordinary risks, the Committee Defendants had a duty to remove the Chesapeake stock as an investment option for the Plan's participants and prohibit the Plan or any participant from investing the Plan's assets in Chesapeake stock.

108.    The Committee Defendants also breached their fiduciary duties by failing to diversify Plan investments. The Committee Defendants were bound by the duty to diversify the Plan's investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." *See* ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C). The Committee Defendants acknowledged the substantial risk of investing in a single security and that it involved a "higher degree of volatility" and "a higher degree of risk." *See* Plan Prospectus at p. 34. Despite acknowledging this risk, the Committee Defendants allowed the Plan to invest over 40% of the Plan's assets in

Chesapeake stock. They then allowed the Plan to invest ***millions more*** in Chesapeake stock in 2014 and throughout 2015.

109.    Despite the power and ability to do so, the Committee Defendants did not take any actions to diversify the Plan's assets. The Committee Defendants' failure to properly diversify the Plan's assets caused the Plan to suffer tens of millions of dollars in losses during the Class Period.

110.    The Committee Defendants also breached their disclosure obligations under ERISA by failing to provide complete and accurate information in the SPD and the Plan Prospectus concerning the Plan's investments in Chesapeake.

111.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Committee Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty against Principal Trust)

112.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 111, above.

113.    During the Class Period, Principal Trust was a fiduciary pursuant to ERISA § 402(c)(3), 29 U.S.C. § 1102(c)(3), or a *de facto* fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.

114.    Under ERISA and the Trust Agreement, Principal Trust had a fiduciary duty to act "solely in the interests (of the Plan's participants and beneficiaries) and with the

care, skill and diligence under the circumstances then prevailing that a prudent person in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *See* Trust Agreement at § .04.

115. Principal Trust breached its fiduciary duties by wrongfully allowing the Plan to buy and hold Chesapeake stock in the ESOP because Chesapeake was not an "employer" for Plan participants and Chesapeake stock was not a "qualifying employer security" for the Plan under ERISA. As set forth above, the inclusion of Chesapeake stock in the ESOP was a *per se* violation of ERISA and, as a Plan fiduciary, Principal Trust acted imprudently by allowing this ERISA violation to occur.

116. Principal Trust's acts and omissions were also imprudent because Chesapeake stock was not an investment the Plan was permitted to own under the Trust Agreement. As set forth above, Chesapeake stock was not a "qualifying employer security" under ERISA and not a mutual fund, ETF, annuity contract or money market fund in which Principal Trust was permitted to invest the Plan's assets. *See* Trust Agreement at § .05(a).

117. Chesapeake stock also does not come within the Trust Agreement's "catch-all" provision that allowed Principal Trust to invest the Plan's assets in "[s]uch assets, securities, or investment options as may be necessary to effectuate the purpose of this Trust." Investing in Chesapeake stock was not necessary, and in fact was contrary to, the Plan's purpose to provide participants with retirement income. Chesapeake stock was historically volatile before the Class Period, and during the Class Period the price of the

stock plummeted. Moreover, the Plan was too heavily concentrated in Chesapeake stock, particularly since the Plan was also invested in Seventy Seven stock.

118.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Principal Trust is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### THIRD CAUSE OF ACTION
### (Co-Fiduciary Liability)

119.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 118, above.

120.    ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Committee Defendants and Principal Trust breached all three provisions.

121.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. As alleged above, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

122.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan

if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Defendants knowingly participated in the each others' breaches because, as alleged above, they participated in the management of the Plan's improper investment in Chesapeake stock and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

123.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

124.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other participants and beneficiaries, lost millions of dollars of retirement savings.

125.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), each of the Defendants is liable to restore the losses to the Plan caused by his or her breaches of the fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

126.    The Plan suffered millions of dollars in losses because Plan assets were imprudently invested in the stock of one company, Chesapeake, in breach of the Defendants' fiduciary duties.

127.    Had the Committee Defendants and Principal Trust properly discharged their fiduciary duties and/or their co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses suffered through the Plan's continued investment in Chesapeake's stock. The Plan should have divested itself of Chesapeake stock immediately following the spin-off and avoided any purchase of Chesapeake stock throughout the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Committee Defendants and Principal Trust have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling the Committee Defendants and Principal Trust to make good to the Plan all losses to the Plan resulting from their breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the Plan and participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    An Order enjoining each of the Defendants from any further violations of their ERISA fiduciary obligations;

D.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investments;

E.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.       An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.       An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

H.       An Order for equitable restitution and other appropriate equitable and injunctive relief against all Defendants.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims that may be tried before a jury.

Dated: February 24, 2017

Respectfully submitted,

 */s/ Bob L. Latham*              
Bob L. Latham, OBA No. 15799
Latham, Wagner, Steele & Lehman
10441 S. Regal Blvd., #200
Tulsa, Oklahoma 74133
Telephone:  918.382.7523
Facsimile:  918.970.2002
E-mail:  blatham@lwsl-law.com

**IZARD KINDALL & RAABE LLP**
Robert A. Izard (pro hac vice to be filed)
Mark P. Kindall (pro hac vice to be filed)
Craig A. Raabe (pro hac vice to be filed)
Douglas P. Needham (pro hac vice to be filed)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
E-mail: rizard@ikrlaw.com
E-mail: mkindall@ikrlaw.com
E-mail: craabe@ikrlaw.com
E-mail: dneedham@ikrlaw.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (*pro hac vice* to be filed)
Ryan T. Jenny (*pro hac vice* to be filed)
Mark G. Boyko (*pro hac vice* to be filed)
1054 31st Street, NW, Suite 230
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
E-mail: gporter@baileyglasser.com
E-mail: rjenny@baileyglasser.com
E-mail: mboyko@baileyglasser.com

**Attorneys for Plaintiff**